2007 WY 18

**Ralph E. PLATT, Appellant (Plaintiff),**

v.

**Alice A. CREIGHTON and Murray C. Creighton, Appellees (Defendants).**

No. 06–62.

Supreme Court of Wyoming.

Jan. 31, 2007.

Representing Appellant: William D. Bagley of Bagley, Karpan, Rose & White, LLC, Cheyenne, Wyoming.

Representing Appellees: Stephen H. Kline of Kline Law Office, PC, Cheyenne, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] Ralph E. Platt (Platt) filed a Complaint alleging that the Defendants, his niece Alice A. Creighton and her husband Murray C. Creighton, held over 151 cows with calves and cows due to calve owned by him in a constructive trust as part of a "joint venture" in conjunction with a lease with the Platt Ranch Trust (the Trust). Platt alleged that the Defendants had failed to account for the joint venture cattle operation and sought an accounting of funds, termination of the constructive trust, and a return of the cattle or their value. The Defendants timely filed a motion for summary judgment. Pursuant to an oral agreement with counsel for the Defendants, Platt filed his response and substantive materials after the deadline established by the district court's scheduling order. The district court ruled that Platt's response to the motion for summary judgment was untimely, that no cause had been shown for the failure to comply with the Wyoming Rules of Civil Procedure and the court's scheduling order and, therefore, Platt had no materials properly before the court subject to consideration in ruling on the motion for summary judgment. The court proceeded to grant the motion concluding that Platt's Complaint was barred by the applicable statutes of limitations, Wyo. Stat. Ann. § 1-3-105(a)(iv)(B) (LexisNexis 2005) (four-year statute of limitations for suits to recover an interest in personal property) and *Cox v. City of Cheyenne*, 2003 WY 146, ¶ 28, 79 P.3d 500, 509 (Wyo.2003) (four-year statute of limitations for suits in equity), because the last transaction concerning the disputed cattle occurred on April 1, 1998 and Platt did not file his Complaint until June 6, 2005, which was outside the four-year limitation period. Platt appeals the district court's ruling. We will affirm.

## ISSUES

[¶ 2] In his brief, Platt sets forth the following issues:

Issue No. 1: Did the District Court err in refusing to accept the agreement of counsel allowing Plaintiff additional time to re-

spond to Defendant's Motion for Summary Judgment when the response was complete and the agreed extension did not interfere with the time table in the Scheduling Order?

Issue No. 2: In the alternative, did the District Court err in refusing to recognize that Plaintiff's reliance on such an agreement was, at worst, excusable neglect as defined by W.R.C.P. Rule 6(b)?

Issue No. 3: Did the District Court err in making its determination based on the Statute of Limitations based on the record before the Court on January 20, 2006?

Issue No. 4: The legal system; bench, bar and client.

In reply, the Defendants frame the issues as:

1. Did the District Court commit error in finding that Plaintiff's failure to file a timely Response to Defendants' Motion for Summary Judgment was inexcusable and in finding that Plaintiff thus had no response before the Court relating to the Motion for Summary Judgment?

2. Did the District Court properly determine that the Statute of Limitations for this action ran prior to the action being filed?

## FACTS

[¶ 3] On June 6, 2005, Platt filed a Complaint containing the following allegations and requests for relief:

On October 10, 2001, Ralph E. Platt and his brother Wayne W. Platt, as tenants-in-common owning the Platt Ranch, formed the Platt Ranch Trust for the purpose of holding the ranch lands.

On or about April 1, 1998, Platt Ranch Trust leased the ranch and related assets to Alice A. Creighton and Murray C. Creighton, husband and wife. The Ranch Lease Agreement provides that:

the leased property includes all of Lessor's deeded land, leased land, Forest Service permits, machinery, equipment, water and water rights, and improvements. All parts, furnishings, inventory, hay upon the premises, seed, furniture,

fixtures, current inventory of supplies, are included in the lease.

The lease also provides that:

Lessees agree during each lease term to pay, when due, all property taxes and liability insurance premiums upon the property. [Lessees] agree to pay all utility charges, fuel, labor, maintenance and repairs of equipment, veterinary expenses, BLM lease charges, Forest Service permit charges, and normal ranch operation costs consistent with their ranching practices.

As part of the ranch operation on or about April 1, 1998, Plaintiff Ralph E. Platt entered into a venture with Alice A. Creighton and Murray Creighton whereby he set over to them one hundred and fifty one cows with calves and cows due to calve having a value of $120,000.00 for use in the ranch operation, and Defendants agreed to pay related veterinary expenses, forest service permit charges and related costs and to provide a fair return on the investment.

Defendants hold Plaintiff's cattle, and Plaintiff's replacement cattle in a constructive trust.

Defendants have refused to account for the joint venture cattle operation and are unjustly enriched.

Plaintiff now seeks an accounting of funds and increase in the venture together with a termination of the resulting trust and a return of said cattle and normal increase, less venture costs, or the value thereof.

The Defendants answered and generally denied the allegations of the Complaint and asserted, among other affirmative defenses, that Platt's claims were barred by the applicable statute of limitations. On September 12, 2005, the district court issued a scheduling order allowing for discovery and setting a deadline of December 1, 2005 for the filing of any dispositive motions and giving the opposing party twenty days after filing to respond.

[¶ 4] On November 30, 2005, the Defendants filed a Motion for Summary Judgment along with supporting materials including excerpts from the deposition of Platt and his brother Wayne, a sworn affidavit from Alice Creighton, and documentation relating to the

operation of the Ranch and the Trust. The Defendants alleged the following facts:

- In October of 2001, the Ranch property, which was jointly owned by Platt and his brother Wayne, was placed in a revocable trust called the Platt Ranch Trust with the brothers as the trustees. Either trustee had the power to make decisions for the Trust without the consent of the other.
- Day-to-day operation of the Ranch was handled primarily by Wayne.
- In 1991, Wayne, who was almost seventy years old, determined that he needed someone to help run the Ranch. The Platt brothers extended an offer to Wayne's daughter and son-in-law, Alice and Murray Creighton, to help run the Ranch operations.
- The Creightons, who had been working on a ranch in Montana, agreed to the offer shortly after the Ranch was placed in the Trust. Since the Ranch could not afford to pay the Creightons the same wages they had been receiving in Montana, an agreement was reached to transfer a small number of cattle from the Trust to the Creightons each year as payment for their services.
- Further, because of the advancing ages of Platt and Wayne, coupled with a lack of interest from their other relatives in the Ranch operations, an additional agreement was reached with the Creightons whereby the Trust's heifers would be traded for an equal amount of steers from the Creightons' personal herd each year. This agreement maximized short-term income for the Trust while allowing the Creightons to build a breeding herd.
- Beginning in January of 1992, the Creightons operated the Ranch as employees of the Trust over the next six years.
- Pursuant to the parties' agreements, cows were transferred annually to the Creightons as compensation for their services while the Trust swapped heifers for herd steers.
- In January of 1992, the Trust owned 350 head of cattle with Platt holding a fifty percent interest. Between January of 1992 and April 1, 1998, forty-eight head of cattle were transferred to the Creightons per the parties' agreement. The Creightons purchased an additional ten outright for cash in 1993. The remainder of the Trust herd either died, came up missing, or was sold at auction with the money going to the Trust so that by April 1, 1998, the Trust held only six cattle.
- On April 1, 1998, the remaining cows and the Ranch's brand were transferred to the Creightons as part of an agreement for them to lease the Ranch for their own cattle operations.
- Platt and Wayne signed the document finalizing the cattle and brand transfer and the Lease.
- Platt denied he initially knew of the agreement to transfer cattle in lieu of salary to the Creightons but admitted that he became aware of it early on and never objected to it.
- Platt also admitted that he was aware that after April 1, 1998, he did not own any cattle personally.
- Pursuant to the Lease between the parties, the Creightons pay the Trust $24,000 a year.
- The Lease, with a renewal in 2003, has continued in effect since April 1998. Platt and Wayne both signed the Lease and have split the annual payment.
- Platt did not assert any ownership interest in or claim any income from the cattle operations on the Ranch outside of the annual Lease payment until the Spring of 2004 when he demanded an accounting from the Creightons; a claim that has triggered the current legal proceedings.

[¶ 5] The filing of the Defendant's Motion for Summary Judgment on November 30, 2005, triggered a twenty-day response period pursuant to the court's scheduling order and W.R.C.P. 6(c). Citing seasonal difficulties and travel conflicts, counsel for Platt contacted opposing counsel before the December 20, 2005, filing deadline and requested an extension through January 4, 2005. Defense counsel agreed to the extension. Platt duly

served his Resistance to Defendant's Motion for Summary Judgment on the Defendants on January 4. Plaintiff's counsel did not file a motion with the district court requesting an extension of the filing deadline or otherwise provide notice of the parties' agreement to the court. The Defendants filed a Reply to Plaintiff's Resistance to Defendants' Motion for Summary Judgment on January 10, 2006 and Platt filed an additional response on January 23.

[¶ 6] On January 20, 2006, without holding a hearing, the district court issued a decision letter granting the Defendants' motion for summary judgment. Preliminarily, the court found that Platt had not filed a timely response to the motion for summary judgment, that no cause had been shown for that failure and, therefore, "Platt [had] no materials properly before the Court nor subject to consideration by the Court with respect to Defendants' motion." The court then concluded that the statute of limitations barred Platt's claim:

> The parties agree that the last transaction at issue here, and the transaction upon which Plaintiff primarily bases his Complaint, occurred on April 1, 1998. All of the events for which Platt seeks relief occurred no later than that date. In fact, the record indicates that the last of the cattle at issue were transferred to Defendants on that date. Platt is seeking an accounting of the cattle, termination of the asserted constructive trust, and a return of the cattle (or their value). His claims are either legal (for a return of his cattle) and governed by Wyo. Stat. Ann. § 1-3-105(a)(4)(i)(B) or equitable (for unjust enrichment) and subject to a four-year statute of limitations, *see Cox v. City of Cheyenne*, 79 P.3d 500, 509 (Wyo.2003). That said, under either scenario, Platt had, at the longest, until April 1, 2002 in which to commence litigation. Here, Platt filed his *Complaint* on June 6, 2005, more than four years after April 1, 1998. Accordingly, Platt's claims are barred by the statute of limitations.

On January 27, 2006 Platt filed a motion stylized as Verified Request for Extension in Time to Respond to Defendants' Motion for Summary Judgment, Motion to Set Aside Default and Petition to Reconsider wherein he asked the district court to set aside the "default", approve counsels' agreement to extend the time for Platt to reply to the motion for summary judgment, and to consider its filed responses to that motion. On February 3, the court issued an order denying Platt's motion, finding that no excusable neglect as defined under W.R.C.P. 6(b) existed for the failure to timely file a response and rejecting an argument by Platt that an "informal or common practice" of the bar excused compliance with the Rules of Civil Procedure.[1] The court's order granting the Defendants summary judgment was issued on February 22, 2006 and Platt's appeal followed.

## STANDARD OF REVIEW

 [¶ 7] When we review the granting of a summary judgment, we employ the same standards and use the same materials as were employed and used by the trial court. We examine the record from the vantage point most favorable to the party who opposed the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. Summary judgment is appropriate only when no genuine issue as to any material fact exists and the prevailing party is entitled to have a judgment as a matter of law. A genuine issue of material fact exists when a disputed fact, if it were proven, would have the effect of establishing or refuting an essential element of the cause of action or defense which the parties have asserted. We review a grant of summary judgment deciding a question of law de novo and afford no deference to the trial court's ruling.

*Black v. William Insulation, Co.*, 2006 WY 106, ¶ 7, 141 P.3d 123, 126–27 (Wyo.2006) (quoting *Burnett v. Imerys Marble, Inc.*, 2005 WY 82, ¶ 10, 116 P.3d 460, 462 (Wyo.

---

1. To the extent that Platt's motion was deemed a "Motion for Reconsideration," the district court properly noted that it was a nullity under the Wyoming Rules of Civil Procedure. *Plymale v.*

*Donnelly*, 2006 WY 3, ¶¶ 5–7, 125 P.3d 1022, 1023–24 (Wyo.2006). The court also noted that there was no "default" entered; it had granted summary judgment.

2005) and *Act I, LLC v. Davis,* 2002 WY 183, ¶ 9, 60 P.3d 145, 148 (Wyo.2002)). "We will affirm a grant of summary judgment if it can be sustained on any legal ground appearing in the record." *Lever v. Community First Bancshares, Inc.,* 989 P.2d 634, 637 (Wyo. 1999) (quoting *Duncan v. Town of Jackson,* 903 P.2d 548, 551 (Wyo.1995)).

## DISCUSSION

[¶ 8] Initially, Platt contests the district court's refusal to consider the materials he filed in response to the Defendants' motion for summary judgment. He argues that the district court should have accepted the agreement between the parties' counsel allowing for extra time in which to respond to the Defendants' motion for summary judgment. Platt contends that such "informalities" are a "common practice" in Wyoming and were entered into by the parties in good faith. Platt suggests that under the circumstances, the court should have treated the failure to file a timely reply as "excusable neglect" under W.R.C.P. 6(b) and considered the materials he filed.

[¶ 9] We have said that "[e]xcept as may be permitted by the Wyoming Rules of Civil Procedure and the Wyoming Rules of Criminal Procedure, time limits permitted or required by rules or court order may not be extended or modified by agreement of counsel, but only by order." *Multiple Resort Ownership Plan, Inc. v. Design–Build–Manage, Inc.,* 2002 WY 67, ¶ 13, 45 P.3d 647, 652 (Wyo.2002) (quoting Rule 202 of the Wyoming Uniform Rules for District Courts).

> The Wyoming Rules of Civil Procedure were adopted to promote an orderly and efficient means for the handling and disposing of litigation. Compliance with these rules of procedure in summary judgment matters is mandatory.

*Hickey v. Burnett,* 707 P.2d 741, 745 (Wyo. 1985) (citing *Larsen v. Roberts,* 676 P.2d 1046 (Wyo.1984)). Motions for summary judgment are governed by W.R.C.P. 56, which in subsection (c) provides that the motion or any responses are to be served pursuant to W.R.C.P. 6(c). That rule, in turn, provides, in pertinent part:

> Except as otherwise provided in Rule 59(c), or unless the court by order permits service at some other time, a party affected by the motion may serve a response, together with affidavits, if any, at least three days prior to the hearing on the motion or within 20 days after service of the motion, whichever is earlier.

W.R.C.P. 6(c)(1). In this case, the district court's scheduling order mirrored the twenty-day time frame for responses set out in Rule 6(c). Subsection (b) of W.R.C.P. 6 provides a mechanism by which a party desiring to enlarge the time in which to file a response can proceed:

> When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court, or a commissioner thereof, for cause shown may at any time in its discretion: (1) with or without motion or notice order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order; or (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect[.]

Since Platt did not move to enlarge the time before the expiration of the prescribed time period, he must show "excusable neglect," which we have defined as "being that behavior which might be the act of a reasonably prudent person under the circumstances." *Weber v. McCoy,* 950 P.2d 548, 553 (Wyo. 1997) (citing *Whitney v. McDonough,* 892 P.2d 791, 794 (Wyo.1995)).

[¶ 10] We cannot agree with Platt's characterization of the informal agreement between the parties' counsel to enlarge the prescribed time for reply to the motion for summary judgment as "excusable neglect" for the failure to file a motion with the court as required by our rules of procedure. Given our precedent, a reasonably prudent person would not simply have relied upon an informal agreement with opposing counsel but would have filed the necessary motion with the court. As the district court put it:

> This Court is not familiar with the "informality" and "common practice" that coun-

sel alleges is apparently so prevalent in his practice. However, it is not the "common practice" of this Court to permit its orders and the Rules of Civil Procedure to be ignored and/or vacated by virtue of some "informality" or "common practice." Rather, it is the "common practice" of this Court to conduct its business in accordance with the Wyoming Rules of Civil Procedure, and its expectation is and always has been that counsel do the same. Counsel's decision to do otherwise was taken at his own peril, but it most certainly was not a matter of excusable neglect.

Platt failed to show "excusable neglect," and the district court did not commit any error when it declined to consider his response to the Defendants' motion for summary judgment.

**▬** [¶ 11] Even if we were inclined to consider the materials filed by Platt, we would still conclude that the district court properly granted the Defendants' motion for summary judgment. Wyoming is a discovery jurisdiction "in which the statute of limitations is triggered when a plaintiff knows or has reason to know of the existence of a cause of action." *Cabot Oil & Gas Corp. v. Followill*, 2004 WY 80, ¶ 14, 93 P.3d 238, 243 (Wyo.2004) (citing *Amoco Production Co. v. EM Nominee Partnership Co.*, 2 P.3d 534, 542 (Wyo.2000)). Platt does not dispute that a four-year statute of limitations is applicable to all of his claims; instead, he argues that he had no reason to believe that his ownership interest in the cattle was claimed by the Defendants until he asked them for an accounting in the spring of 2004. It is from that date that Platt insists the statute of limitations began to run.

[¶ 12] In his affidavit contained within his filings opposing the motion for summary judgment, Platt contended that the parties' arrangement was for the Defendants to run Platt's cattle and to take a share of the profits. According to Platt, the Defendants held the cattle in trust, and ownership remained with him. In support of his claim, Platt alleged that when the Defendants entered into the lease in 1998, they were also supposed to enter into a mortgage of the cattle with him to prevent the Defendants

from selling the cattle or using them for collateral. Platt claimed that he refused to sign the mortgage because the place to enter the number of cattle to be mortgaged was blank, and that while the Defendants promised to get a count of the cattle, they never got back to Platt and the mortgage was never executed.

[¶ 13] Platt's claim is predicated on a contention that he possessed an ownership interest in the cattle on the Ranch. In his deposition, Platt's brother Wayne testified as follows (emphasis added):

Q: Was there actually money given to the trust for the cattle that were left in 1998 that had not previously been transferred by wage or purchase?

A: No.

Q: Do you remember how many cattle there were at that time that were transferred from the trust to Alice and Murray Creighton?

A: That total was approximately 280 head, but I couldn't say who owned them for sure because they had interest in the cattle. And they were all branded IK as undivided interest.

Q: There were 280 head in 1992?

A: Yeah.

Q: Had some died?

A: Some died.

Q: Had some been sold?

A: They were replaced by calves, or such a matter, because you keep so many replacements so you keep your herd at static level.

Q: The ones that had been sold—There were some sold to Murray and Alice Creighton; is that correct?

A: Only the culled cattle through the feedlots.

Q: And the money that you got—the money that was received for culled cattle that was sold, what happened to that money?

A: *It went into the trust. In fact, all the cattle were sold by the trust, went back into the trust, and it went to pay off the loans at the bank. We wound up—when we turned it all over and sold*

*all the cattle we owned interest in, we still owed the bank 40,000 bucks.*

. . . .

Q: When [the Defendants] took calves at branding, is there any record of how many and what this was worth for tax purposes or otherwise?

A: No record or written record, no.

Q: Do you have any recollection as to how many calves they were to take at branding, all of them, half of them, part of them?

A: I don't know how many they were promised. I couldn't say.

Q: You don't know what they were promised?

A: I couldn't say what the number they were promised or what, no.

Q: Is it all they could brand?

A: No, not all they could brand, just only the number that we had promised.

Q: But you don't—

A: I don't know the number.

Q: Was it a number like a hundred or a number like half or a number like a third?

A: It was a number like four or five or eight or ten.

Q: Four or five or eight or ten each year.

A: So many each year.

Q: Four to ten calves branded for supplement to wages?

A: Yeah. Then they kept their half for calves, and consequently their herd increased.

Q: So maintaining didn't work after that?

A: Well, it didn't maintain. *We wasn't trying to maintain our herd.* I was trying to build up their herd.

Q: Didn't you feel that would reduce your obligation to your brother, 50/50 partner?

A: Well, when you're starting to trade steer for heifers, you're getting the better end of the deal. That's what we were doing, and those steers that we traded from them and they took heifers in place, the steers were worth more on the market than the heifers for the main reason they weigh more.

Q: But your emphasis changes now from maintaining—

A: *We were not trying to maintain Platt Ranches Trust cattle. We were transferring our cattle to them.*

Q: To your daughter?

A: Through their purchase and branding and what they earned.

. . . .

Q: So you're letting them work into the ranch that you and Ralph owned?

A: *The ranch numbers are staying the same, but the cattle is under different ownerships.*

Q: And—

A: *So eventually we will phase out what we own, and they will own it.*

Q: When you say they, you mean your heirs, not Ralph's heirs?

A: My heirs.

. . . .

Q: And when you transferred up all the cattle to Murray and Alice Creighton in 1998, they were actually transferred from the trust to them; is that correct?

A: That's right.

Q: And, in fact, when the cattle sold from '92 to '98, the income from that cattle went into the Platt Ranch Trust; is that right?

A: That's right.

In his deposition, Platt admitted to being aware of that agreement to transfer cattle to the Defendants. Furthermore, he signed the documents transferring the remaining cattle and the Ranch brand to the Defendants on April 1, 1998. As the district court noted, the April 1, 1998 transactions were the last acts underlying Platt's cause of action. If Platt had retained an ownership interest in those cattle, then there is no question that he knew or should have known that he had a cause of action at that time. The district court correctly held that the four-year statute of limitations had been triggered and that Platt had, at the latest, until April 1, 2002, to commence litigation. Platt's Complaint was not filed until June 6, 2005, and, accordingly, his claims are barred.

[¶ 14] In passing, we note that even if we had accepted Platt's argument

regarding commencement of the statute of limitations, even then the Defendants were still entitled to summary judgment. "When the party moving for summary judgment has established a prima facie case, the burden of production shifts to the opposing party who then is obliged to marshal admissible evidence, as opposed to general or conclusory allegations, establishing continuing viability of an issue of material fact." *Estate of Coleman by and through Coleman v. Casper Concrete Co.*, 939 P.2d 233, 236 (Wyo.1997) (citing *Hanna v. Cloud 9, Inc.*, 889 P.2d 529, 534 (Wyo.1995)). The Defendants produced evidence showing that ownership of the trust cattle had been transferred to them. It was incumbent upon Platt to respond with admissible evidence rebutting the Defendants and showing that Platt retained an ownership interest in the cattle. The record contains no such evidence, only allegations. No matter how the record is viewed, the Defendants were entitled to summary judgment.

### CONCLUSION

[¶ 15] The district court order granting the Defendants' summary judgment is affirmed.